**UNITED STATES of America, Plaintiff,**

v.

**PROFESSIONAL AIR TRAFFIC CONTROLLERS ORGANIZATION (PATCO), et al., Defendants.**

No. 81 C 4371.

United States District Court, N. D. Illinois, E. D.

Nov. 6, 1981.

On Motion To Disqualify Court Nov. 12, 1981, see 527 F.Supp. 1351.

Fred Branding, Asst. U. S. Atty., Chicago, Ill., for plaintiff.

Michael A. Stiegel, Arnstein, Gluck & Lehr, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

On October 16, 1981, this Court issued a temporary restraining order, which was stayed until October 17, 1981, requiring that the defendants and those acting in concert with them remove the structures and other paraphernalia that they had erected, wood that they had stockpiled, and burning barrels that they had placed on the premises owned and operated by the Federal Aviation Administration ("FAA") at the Air Route Traffic Control Center in Aurora, Illinois, and further requiring that defendants refrain from engaging in the activity outlined in the order pending a determination on the merits in the context of a preliminary injunction hearing scheduled for October 21, 1981. At the request of defense counsel, the preliminary injunction hearing was rescheduled for October 27, 1981, and the temporary restraining order was continued to that date by consent. Proceedings were had on the preliminary injunction on October 27, 28,[1] and November 4, 1981.[2] On

---

1. On October 28, 1981, the Court ordered that the temporary restraining order be extended to November 4, 1981, in order to preserve the status quo during the preliminary injunction hearing. Although defense counsel indicated at that time that he would be reluctant to consent to such an extension without a guarantee that some heating element could be set up at the picketing site during the night, no formal objection was made on the record, and the Court indicated that the question of the heating element would be discussed in the context of a final order at the close of the evidence. See Transcript of Proceedings held on October 28, 1981, at 218. At the conclusion of the hearing on November 4, 1981, the Court again extended

2. See note 2 on page 1347.

the basis of the evidence adduced at the hearings and the arguments of counsel, the Court is now prepared to enter a preliminary injunction restricting the place and manner of the picketing at the Aurora facility as set forth fully below.

■ At the outset, defendants contend that the property upon which the picketing and other activities are taking place outside the Aurora facility is subject to an easement in favor of the City of Aurora and, thus, that although the property is concededly owned by the federal government, it is subject to the "control" of the City of Aurora. As a result, according to defendants, the government has no right to complain about the activities on the property occupied by the picketers. Defendants' argument does not withstand analysis.

It is undisputed that on August 3, 1964, the FAA granted to the Aurora Township Road District an easement "for the purpose of a public road, but for no other purpose" and that the picketing and other activities being conducted by the PATCO defendants outside the Aurora facility are occurring on the property that is subject to the easement in favor of Aurora. But it does not necessarily follow that the government has no right to complain about the defendants' activities solely because they are occurring on property that is subject to an easement in favor of a local body. First, the easement was granted for a limited purpose and the

FAA and the federal government retain the right of access to the property and, more importantly, the right to have unimpeded use of the property upon which the Aurora facility is located. Secondly, even if the existence of the easement is somehow relevant to the government's right of control over that property, there is no authority for the proposition that this precludes the government from complaining about the activity on the easement if such activity should interfere with the health and safety of FAA employees or the efficient operation of the FAA facility. Accordingly, the fact that the picketing and other activities are occurring on property owned by the federal government but subject to an easement in favor of the Aurora Township Road District has no effect upon the merits of the pending motion for a preliminary injunction.

■ Another threshold matter concerns the scope of the preliminary injunction hearing. Throughout the proceedings held on October 27, 28, and November 4, 1981, defense counsel objected to the introduction of any evidence that did not bear directly on the structures or burning barrels that had been placed outside the main gates of the FAA facility in Aurora by defendants on the ground that such evidence was beyond the scope of the proceedings. However, the preliminary injunction proceedings had never been contemplated as being of

the restraining order pending a ruling on the preliminary injunction motion which the Court anticipated issuing by November 6, 1981. This time the extension was over the objection of defense counsel. There is authority for the proposition that where the moving party has exercised good faith in seeking preliminary injunctive relief but has been unsuccessful in obtaining such relief whether because of court delay or otherwise, the district court has discretion to extend the restraining order beyond the period contemplated by Fed.R.Civ.P. 65(b), particularly where the danger of irreparable injury still exists. *See State of Maine v. Fri*, 483 F.2d 439, 441 (1st Cir. 1973); Wright & Miller, Federal Practice and Procedure § 2953 (Supp. 1980). As the court stated in *Fri, supra*, "as long as the hearing on the preliminary injunction is held expeditiously within the appropriate time frame, the district court should be able

to extend the restraining order while it prepared its decision." 483 F.2d at 441.

2. At the conclusion of the hearing on November 4, 1981, the Court reopened the evidence for the limited purpose of having the United States Marshal file a diagram and measurements of the frontage of the Aurora facility. The measurements together with the affidavit of the Marshal who made them were filed with the Court on November 5, 1981, and the evidence was reclosed thereafter. The measurements need not be to scale since the precise dimensions are not in issue in this proceeding, and this opinion is not premised on the need for such exactitude as would be accomplished by a formal survey. Rather, the measurements were necessary to give the Court a proper perspective on the area in which the activities are occurring at Aurora.

such a limited nature.[3] On October 16, 1981, the government moved for an order that would require defendants to remove the structures that had been erected at the Aurora facility and the wood they had stockpiled, prohibit the setting of fires in barrels or otherwise, and "prohibit any activity which could be characterized as creating a 'battle line' atmosphere at the Chicago Center." In outlining the perimeters of the preliminary injunction hearing during the course of our opinion on October 16, 1981, the Court said, "[a]t that time, the Court expects the government to be prepared to proceed with evidence as to the potential and actual dangers engendered by the defendants' activities at the Aurora facility." *United States v. Phillips,* 527 F. Supp. 1340 at 1343 (N.D.Ill.1981). Thus, the preliminary injunction hearing was intended to encompass not only the issue of the structures and burn-barrels, but also the government's allegations that the totality of defendants' activities outside the Aurora facility threatened the efficient operation of the Aurora facility and the health and safety of FAA personnel. Accordingly, we proceed to a discussion of the merits of the government's motion for preliminary injunctive relief.[4]

In order to support the entry of a preliminary injunction, the movant must show the existence of irreparable harm and the absence of an adequate remedy at law, a probability of ultimate success on the merits, that the threat of harm to the movant outweighs the harm that would result to the opposing party should the injunction issue, and that the public interest will not be disserved by the granting of injunctive relief. *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 (7th Cir. 1976); *Ohio-Sealy Mattress Manufacturing Co. v. Duncan,* 486 F.Supp. 1047, 1052 (N.D.Ill.1980). In the case at bar, these requirements are clearly met.

During the course of the three days of hearings just concluded, the government presented a fair amount of evidence in support of its charges that the defendants'[5] activities at the Aurora facility seriously jeopardize the government's legitimate interest in the efficient operation of the facility and the health and safety of FAA personnel who work there. The Court heard testimony from working controllers who described their passage through the defendants' encampment at the facility on a daily basis. The police barricades containing the picketers are set flush with the roadway and main driveway, which is about 24 feet in width. The picketers have tended to remain on the southwest side of the main driveway and the agreed order limits their number to 30, with a mass picketing of 500 permitted once a week upon appropriate notice to the United States Marshal. The testimony also indicated that the picketers yell obscenities at persons entering and leaving the facility, that nails have been strewn on the driveway, that objects have been thrown at cars entering or leaving the facility, that physical confrontations have occurred between picketers and FAA employees, and that the net effect is akin to having to "run the gauntlet" in order to get into or out of the facility during a shift change. FAA personnel also testified that when the shanties and lean-tos that defend-

---

3. During the course of the proceedings, the Court repeatedly informed defense counsel that the proceedings encompassed more than the matter of the structures and the burn-barrel, but counsel continued to object to the introduction of evidence concerning defendants' other activities at Aurora. Consistent with the Court's admonitions both at the hearing and in its October 16, 1981, order, counsel for defendants was afforded the opportunity to rebut all evidence offered by the government at the hearing.

4. The parties agree that the decertification of the Professional Air Traffic Controllers Organization ("PATCO") as the exclusive bargaining agent for the controllers vis-a-vis the FAA by the Federal Labor Relations Authority on October 22, 1981, has no effect on the issues discussed herein.

5. Throughout this opinion, the term "defendants" is used broadly to encompass the named defendants as well as those acting in concert with them at the Aurora facility.

ants had erected were standing, their ability to see the traffic on Indian Trail Road immediately to the south of the facility intersecting the main driveway was impaired by the structures as well as by the persons clustered about when they drove down the main driveway away from the facility. Although there have been no traffic accidents so far, the testimony indicated that danger of such a possibility exists.

There was also testimony to the effect that statistically the greatest likelihood of controller error exists during the first 30 minutes after a controller assumes his or her position. Several controllers testified that they have been nervous and under considerable stress since the defendants set up camp at the entrance to the facility and that they feel that their job performance has or may suffer as a result. At least one controller had to be relieved of his position soon after he reported for work because, in his supervisor's view, he was too agitated to properly handle his duties as a result of his encounter with the picketers outside the facility. One controller testified that he and his wife, also a controller, try to get to work early so that they can calm down before beginning their duties and leave late to avoid confrontations with the picketers outside the facility during the unusually active period around the shift changes.

As defense counsel stated during his closing argument before the Court, tempers and emotions have tended to run high on both sides of this dispute as the confrontation between PATCO and the FAA continues into its fourth month. The totality of the evidence presented during the hearing indicated the potentially volatile situation outside the Aurora facility during the period prior to the issuance of the temporary restraining order on October 16, 1981, and continuing to some extent thereafter. The Court is satisfied that the government has met its threshold burden of showing that it may suffer irreparable harm if defendants' activities are not restricted in some way, consistent with the principles embodied in the first amendment.

■■ It is firmly established that picketing is expressive activity entitled to first amendment protection. *Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 2289, 65 L.Ed.2d 263 (1980); *Police Department of Chicago v. Mosley*, 408 U.S. 92, 98, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212 (1972); *Thornhill v. Alabama*, 310 U.S. 88, 102, 106, 60 S.Ct. 736, 744–46, 84 L.Ed. 1093 (1940). This is not to say that all forms of picketing must always be allowed. Courts have consistently upheld reasonable time, place and manner restrictions on picketing necessary to further significant governmental interests. *Mosley, supra,* 92 S.Ct. at 2291; *Grayned v. City of Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 2303–04, 33 L.Ed.2d 222 (1972); *Concerned Jewish Youth v. McGuire*, 469 F.Supp. 1296, 1299 (S.D.N.Y.1979); *National Treasury Employees Union v. Fasser*, 428 F.Supp. 295, 298, (D.D.C.1976). The test to be applied when speech and nonspeech elements are combined in the same act as set forth by the Court on *United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). Thus, a restriction will be upheld if it (1) furthers an important government interest (2) unrelated to the suppression of expression, and (3) the incidental restriction of protected first amendment activity is not greater than is essential to the furtherance of the government interest. *See National Treasury Employees Union, supra,* 428 F.Supp. at 298. Where the government can further its interest by a lesser restraint at little or no added inconvenience to the first amendment rights of the picketers, it must do so. *United States v. Robel*, 389 U.S. 258, 267–68, 88 S.Ct. 419, 425–26, 19 L.Ed.2d 508 (1967).

■ In the case at bar, the government has not sought a complete ban on picketing at the Aurora facility. *See, e.g., Nelson v. City of Chicago*, 52 CCH Lab.Cas. ¶ 16,698 (N.D.Ill.1965). Rather, it merely seeks to assure that its legitimate interests and those of its employees are adequately protected along with the first amendment rights of the defendants. At the same time, however, the Court agrees with the defendants that to the extent that the

government seeks to deny them absolutely no shelter nor heat at the Aurora site, such relief would exceed that necessary to the advancement of legitimate governmental interests. As defense counsel aptly stated during the hearing, the absence of any heat or shelter at the Aurora site would effectively "chill" the defendants' exercise of their first amendment rights during the coming winter season. Yet, it is clear that there is a strong likelihood that the government will ultimately prevail in its efforts to have the Court impose some restrictions on the defendants' activities consistent with the first amendment and, thus, the second element of the test for preliminary injunctive relief is satisfied. In the Court's view, a properly tailored order can accommodate the legitimate interests of all parties concerned.

The balance of the hardships in this case, along with the public interest, also strongly favors the entry of some sort of injunctive relief limiting the activities of the picketers at Aurora. As we indicated earlier in this opinion, the current state of affairs at the Aurora facility constitutes a substantial threat to the efficient operation of the facility and the health and safety of FAA personnel who must pass through the area occupied by the defendants each day on their way to and from work. The defendants can claim no hardship if their speech is allowed to continue and be heard, subject to reasonable restrictions necessary to the furtherance of legitimate governmental interests. As the court said in *National Treasury Employees Union v. Fasser*, 428 F.Supp. 295, 298 (D.D.C.1976), "[s]topping the disruption of Government services justifies an incidental limitation on First Amendment freedoms." In the context of the case at bar, informational picketing that is limited in place and focus, and which does not interfere with the operation of the FAA facility at Aurora or endanger FAA personnel, is permissible under the terms of the agreed order [6] under which the parties have been operating and the first amendment.

As we stated earlier, the government has not shown any legitimate interest in denying defendants shelter or heat in connection with their vigil at the Aurora facility as long as the shelter and heating element do not constitute a safety hazard or interfere with the operation of the FAA facility. In fact, during the preliminary injunction hearing, defense counsel suggested that an adequate alternative to the shanty, lean-to and burn-barrel that defendants had put on the property would be a tent and a clean burning kerosene camping heater. Accordingly, the Court will allow the defendants to have a tent and a kerosene heater provided that they are placed at the distances from the main driveway and Indian Trail Road indicated below.

The Court finds it necessary to limit the placement of the tent and the heater in order to reduce the possibility of any physical confrontation between the picketers and the FAA personnel and to assure an unobstructed view of the intersection of Indian Trail Road and the main driveway to the FAA facility. The testimony at the hearing indicated both the danger of such physical confrontations and the obstruction of the view due to the shelters themselves and the clustering of people around the shelters and the burn-barrel. In order to further assure that the view of traffic will be unobstructed and to further defuse a potentially volatile situation, the Court will also order that the barricades that are currently placed at the edge of the main driveway and Indian Trail Road be set back from the roadway and the driveway.

Accordingly, the government's motion for a preliminary injunction is granted.[7] It is further ordered that:

---

**6.** As of this writing, neither party has indicated a desire to withdraw from the agreed order. Moreover, nothing in this opinion is inconsistent with the terms of the agreed order nor is anything in this opinion intended to detract from that order. In the event that the agreed order is abrogated, the Court reserves the option to conduct a hearing in order to determine whether the preliminary injunction outlined below should be broadened in any manner.

**7.** During the preliminary injunction hearing on

1. The barricades currently resting at the western edge of the main driveway and the northern edge of Indian Trail Road be moved to a point at least eight feet back from the road and the driveway;

2. At a point not less than 100 feet to the west of the main driveway and not less than eight feet from Indian Trail Road, defendants may place a tent for the purpose of providing some shelter during the inclement weather. The tent shall not exceed 10 feet in length, six feet in width, or eight feet in height;

3. In the immediate vicinity of the tent described above, defendants may place a small, clean-burning propane heater. A 20 to 100 pound tank may be used in conjunction with the heater, pending presentation by the government of any evidence as to health and safety dangers inherent in the use, location, or size of the tank. The heater and tank should not, in any event, be located less than 8 feet from Indian Trail Road or more than 15 feet from the tent.

It is so ordered.[8]

## On Motion to Disqualify Court

This matter comes before the Court on defendants' motion seeking to disqualify the Court from further participation in this case pursuant to the provisions of Title 28, United States Code, Sections 144 and 455(a), and (b)(1). Specifically, defendants claim that the Court has a personal bias or prejudice either against them or in favor of the government, or both, within the meaning of 28 U.S.C. § 144; that the Court's impartiality might reasonably be questioned within the meaning of 28 U.S.C. § 455(a);

and that the Court has personal knowledge of disputed evidentiary facts concerning this proceeding within the meaning of 28 U.S.C. § 455(b)(1). On October 26, 1981, the defendants' motion was denied.[1] The reasons for this ruling are set forth herein.

## I.

■ As a threshold matter, we note that defendants have not moved to have another judge of this Court pass on their motion for disqualification, and we do not deem such a procedure necessary under the circumstances of this case. This case was assigned to the Court by lot on August 3, 1981. Since that time, except for the issuance of the temporary restraining order by Judge Shadur in our absence on the morning of August 3, we have been intimately involved with all facets of this case on an almost daily basis. As Judge Sirica noted in the context of a motion seeking his recusal during the "Watergate" case:

A judge challenged under these statutes ought to be willing to shoulder the responsibility of ruling in the matter. Only the individual judge knows fully his own thoughts and feelings and the complete context of facts alleged. It follows that only he can be certain of the most equitable resolution.

*United States v. Mitchell,* 377 F.Supp. 1312, 1315 (D.D.C.1974), *aff'd,* 559 F.2d 31 (D.C. Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Although judges have, on occasion, referred the question of their own disqualification to another judge for disposition, we think the better procedure in this case is for the judge pre-

November 4, 1981, the government made a motion to consolidate the preliminary injunction pursuant to Fed.R.Civ.P. 65(a). That motion was taken under advisement at the time and it will remain under advisement. Should the Court deny this motion, we will, of course, consider the evidence admitted during the preliminary injunction hearing as part of the record in the context of any subsequent proceedings to convert the preliminary injunction into a permanent injunction.

8. The Court notes that defendants' activities have apparently been limited to the area west of the main driveway and immediately to the

north of Indian Trail Road. In the event that the defendants choose to move to the east side of the driveway, the Court intends that this order be interpreted so as to provide the same limitations on defendants' activities at that location.

It is further ordered that no additional structures, additions, or articles of any type be constructed at the picketing site without prior petition of, and approval by, the Court.

1. The Court stated in the minute order denying defendants' motion that a written opinion would follow.

siding over the case to resolve the motion for disqualification since we are in the best position to appreciate the circumstances surrounding the allegations in the affidavits. *United States v. International Business Machines Corp.,* 475 F.Supp. 1372, 1376 n.4 (S.D.N.Y.1979), *aff'd,* 618 F.2d 923 (2d Cir. 1980).

The Court also does not deem an evidentiary hearing necessary to a just resolution of the matters raised by defendants' motion for disqualification; nor have defendants requested such a hearing. The government has submitted affidavits of persons present during the Court's on-site inspection of the Aurora facility during which defendants maintain the Court acquired such personal knowledge of evidentiary facts outside the record as to render it partial to the government and personally biased or prejudiced against defendants. The affidavits submitted by both sides together with their accompanying legal memoranda provide a sufficient record upon which this Court may determine the pending motion for disqualification.

During the three months that this Court has presided over this often contentious and emotional litigation between the government and the local affiliates and local and regional officers of the Professional Air Traffic Controllers Organization ("PATCO"), a continuing point of contention has been the permissible scope of the informational picketing undertaken by the defendants and PATCO members at the Air Route Traffic Control Center in Aurora, Illinois. Since August 13, 1981, the parties have been operating subject to an agreed order as amended which was negotiated by the parties' representatives and counsel for both sides and entered by this Court, that spells out the responsibilities of the government and the defendants with respect to the informational picketing allowed at the Aurora facility. Almost immediately after the agreed order was entered, however, the government began complaining that defendants were not complying with its terms.[2] The Court repeatedly advised counsel and the parties to try to work matters out for themselves consistent with the terms and the spirit of the agreed order or, if necessary, to file an appropriate motion for judicial action.

On October 14, 1981, during an in-chambers conference held at the parties' request between the Court, counsel, and PATCO and Federal Aviation Administration ("FAA") representatives, the government brought to the Court's attention the facts that defendants had erected various structures (including lean-tos and a mailbox) outside the main gates of the Aurora facility, had stockpiled wood and other fuel items at the facility, and had built a fire in a steel drum in the area in conjunction with their virtual round-the-clock vigil at the facility. The government contended that defendants' activities exceeded the bounds of the agreed order and that they endangered the health and safety of FAA employees and residents of the area and also interfered with the effective operation of the Aurora facility. The defendants maintained that they were acting in accordance with the agreed order and the first amendment. The Court directed the parties to attempt to reach an agreement with respect to the activity that would be permitted at the facility consistent with the agreed order and stated that if the parties and counsel could not reach such an accommodation, a formal hearing would be held in order to resolve any disputes.

During the conference, the Court also indicated that it was contemplating a visit to the Aurora facility and the picketing site in order to gain a better understanding as to the nature and location of the activities that the parties had described.[3] Counsel

---

2. These complaints were brought to the Court's attention either during various hearings on unrelated matters held on the record in open court or during off-the-record in-chambers discussions between the Court, counsel for both

sides, and, at times, representatives of the parties.

3. In previous court proceedings as well as during the in-chambers conference of October 14, the Court had been presented with photographs, sketches, and descriptions of the Auro-

for neither side objected to the Court making such a view of the premises, although defense counsel stated that he wished to be present when the Court made its visit. Counsel for both sides stated that should they visit the Aurora facility with the Court, they would not notify their respective clients so that the visit would be unannounced.

Counsel and the parties indicated that they would attempt to resolve the situation by October 16, 1981. Having failed to reach an accommodation among themselves by that date, an appropriate motion was filed by the government and a hearing was held on the record in open court. The single government witness at the hearing, Mr. H. Douglas French, Deputy Chief of the Aurora Facility, testified as to the existence of the structures outside the facility. Defendants did not dispute the government's evidence or put on any testimony of their own. Rather, they again contended that their conduct was permissible under the terms of the agreed order and the first amendment. Surprisingly, no evidence was presented in support of the government's charges, made both in-chambers and in open court, regarding the effect of defendants' activities on the health and safety of FAA employees or residents of the area and the interference with the effective operation of the facility. The Court indicated that if such evidence were adduced, and if it withstood cross examination, the Court would be inclined to issue a broad-ranging order going beyond the terms of the agreed order. Nevertheless, the Court concluded on the basis of the

evidence presented at the hearing that defendants' building of shanties, lean-tos, and other structures outside the Aurora facility and the building of fires and other indicia of permanent occupation, such as a mailbox, on federal property went beyond the informational picketing allowed by the agreed order and the first amendment and, on that basis, indicated that it would issue an order proscribing such activity. Accordingly, the Court requested that the government draw up an order, subject to opposing counsel's inspection, that would require the removal of existing structures, a prohibition on new structures, and the discontinuance of the burning barrels and other indicia of defendants' permanent occupation of the premises that did not fall within the ambit of informational picketing permitted by the agreed order.

Later that same day, the Court visited the Aurora facility, as it had indicated it would, accompanied by Mr. Peter Wilkes, United States Marshal for the Northern District of Illinois. In accordance with the in-chambers discussions of October 14, 1981, counsel for both parties were invited to join the Court on its visit, but neither side accepted the invitation nor did counsel object to the Court's visit.[4] However, in contravention of the earlier agreement that the Court's visit would be unannounced, one of defendants' counsel called the PATCO outpost at the Aurora facility and forewarned defendants and the contingent of picketers that the Court would be visiting the facility.[5] When we arrived at the facility, we

ra site that were in apparent conflict depending upon which party proffered the evidence. The Court wished to view the scene itself in order to better appreciate the context of the parties' positions.

4. After the Court had departed for Aurora accompanied by Marshal Wilkes, the Court's secretary telephoned counsel for both sides and relayed the invitation to meet the Court at the facility. After some initial difficulty contacting counsel, each was notified of the Court's plans and each declined to meet the Court at Aurora. Counsel for neither side objected to the Court's visit at that time. Counsels' decisions not to join the Court at the facility were relayed to the Court by telephone hookup between the Dirk-

sen Federal Building and Marshal Wilkes' car. Only after the Court learned that counsel would not accompany it to Aurora and that counsel did not object to the visit did it approach the facility.

5. Defense counsel Stanley Lipnick was apparently unaware of co-counsel Michael Stiegel's agreement that PATCO would not be given advance warning of the Court's visit. When he learned that his forewarning of the PATCO outpost at Aurora contravened Mr. Stiegel's earlier agreement, Mr. Lipnick dispatched a letter to the Court, dated October 16, 1981, and delivered that day by messenger, the full text of which read:

observed the picketers outside the main gates, initially from a distance and then from a more proximate vantage point near the picketers themselves. We observed the structures that had been erected at the site and the traffic flow in and out of the facility. We exchanged pleasantries as a matter of common courtesy and nothing more with those persons whom we recognized from previous proceedings in court. Although the Court heard unsolicited complaints from U.S. Marshals regarding rocks being thrown at cars entering or leaving the facility and allegations that cars were being spat upon by the picketers, these same allegations had been made in open court and during in-chambers discussions in the presence of counsel and representatives of the parties.[6] We then went inside the facility where we were given a short tour by the deputy chief, Mr. H. Douglas French, before we proceeded back to our chambers in the Dirksen Federal Building.

The visit to the Aurora site provided the Court with a greater understanding of the conditions outside the FAA facility. As a result of the visit, the Court was in a better position to appreciate the context of the government's allegations that the defendants' activities were a health and safety hazard and that they interfered with the operation of the facility as well as the defendants' position to the contrary. Rather than continue with the charges and countercharges regarding the effect of defendants' activities at Aurora, both in court and during in-chambers conferences, the Court desired to put the case in a posture whereby the government would have an opportunity to prove its allegations, and defendants would have an opportunity to defend against them and present evidence in their own behalf.[7]

Accordingly, the Court modified its earlier order and entered an order in the nature of a temporary restraining order with a full preliminary injunction hearing scheduled for October 21, 1981, at 10:00 a. m.[8] The substance of the order entered after the Court's visit to the Aurora site remained

---

Dear Judge Aspen:

When I received your secretary's call shortly before 2:30 this afternoon advising that you were on your way to observe the picket line at the Aurora Center, I was not aware of Mr. Stiegel's agreement that PATCO would not be given advance warning of your inspection. I therefore advised PATCO of your impending visit. I assure you the failure to observe Mr. Stiegel's undertaking in chambers was inadvertent and apologize for it.

While it is not clear to me that any significant change was made following my call, I am authorized to convey PATCO's assurance that the picket area will, if anything, be more orderly over this coming weekend than when Your Honor saw it.

Respectfully yours,
Stanley M. Lipnick
[Signed]

Mr. Lipnick's letter clearly establishes that counsel was invited to accompany the Court on its trip to Aurora but that they declined the invitation and that the defendants themselves had advance notice of the Court's visit. Moreover, the letter does not contain any objection to the Court's visit to Aurora.

6. In fact, the government had filed a petition to have Mr. John Roche held in contempt of court for allegedly throwing a rock at a car entering the facility. During the hearing earlier that day, October 27, 1981, was set as the date for a hearing on the contempt petition. The petition for the rule to show cause, with its allegations of rock throwing, was thus a part of the record at the time of the Court's visit to Aurora. Another petition for a rule to show cause charging Mr. Curt Peterson with intimidating a FAA employee was also filed that day and made a part of the record. On October 27, 1981, and subsequent to the filing of the instant motion, this Court ruled against the government and for the defendants on both the Roche and Peterson petitions.

7. Moreover, at the hearing held earlier that day, defendants had indicated that they would like an opportunity to present evidence to rebut the government's contention, and the Court's finding, that the property outside the main gates of the Aurora facility was owned by the federal government. The Court had indicated at that time that it would consider any evidence in this regard that defendants cared to submit and, if necessary, change its order accordingly.

8. The hearing was subsequently rescheduled for October 27, 1981, at defendants' request, and the temporary restraining order was continued by agreement to that date as well. Hearings were held on October 27, 28, and November 4, 1981. On November 4, 1981, at the conclusion of three days of hearings on the motion for a preliminary injunction, the Court

the same as the order that the Court indicated it would enter at the conclusion of the hearing earlier that day,[9] but the scope of the order was limited so that both sides would have an opportunity to present evidence on the question of the effect of the picketers' activities on the operation of the facility and the health and safety of FAA employees which was not resolved at the hearing. The order that was ultimately issued on October 16, 1981, was thus more favorable to the defendants than the order that was contemplated at the close of the hearing since implicit in the ultimate order was the assumption that if the government could not substantiate its charges at the preliminary injunction hearing, defendants could resume their activities as before the temporary restraining order was entered, provided that they could sufficiently tailor their activities at Aurora to comply with the terms of the agreed order.[10]

On October 22, 1981, approximately one week after the Court issued its opinion and order on October 16, 1981, defendants filed the instant motion for disqualification. We now proceed to a discussion of the merits of that motion.

## II.

■■■■ A judge presented with a timely[11] motion for disqualification pursuant to 28 U.S.C. § 144 must disqualify himself from further participation in a case if, assuming the truth of the facts alleged, a reasonable person would conclude that the facts are sufficient to show judicial bias or prejudice. *United States v. Jeffers*, 532 F.2d 1101, 1112 (7th Cir. 1976), *aff'd in part and vacated in part*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977); *Mims v. Shapp*, 541 F.2d 415, 417 (3d Cir. 1976); *Davis v. Board of School Commissioners of Mobile County*, 517 F.2d 1044, 1051–52 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *United States v. Baker*, 441 F.Supp. 612, 616 (M.D.Tenn. 1977). The motion must be accompanied by an affidavit of a party to the proceedings, *United States ex rel. Wilson v. Coughlin*, 472 F.2d 100, 104 (7th Cir. 1973); *Giebe v. Pence*, 431 F.2d 942 (9th Cir. 1970), which must set forth the facts supporting the allegations of bias or prejudice. While the court must accept all factual allegations as true, *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed.2d 481 (1921), mere conclusions, opinions, rumors, or vague gossip are insufficient and need not be accepted as true by the court. *Hodgson v. Liquor Salesmen's Union Local No. 2*, 444 F.2d 1344, 1348 (2d Cir. 1971); *Action Realty Co. v. Will*, 427 F.2d 843, 844 (7th Cir. 1970).

again continued the restraining order until November 6, 1981, on this occasion over defense counsel's objection, at which time the Court anticipated issuing its memorandum opinion and order resolving the question. On November 6, the Court issued a preliminary injunction allowing the defendants use of a tent and a small, clean-burning space heater to be placed at specified positions outside the main gates of the FAA facility in Aurora and further ordering that the barricades containing the picketers outside the facility be moved back a specified distance from the road and main driveway. *See United States v. Professional Air Traffic Controllers Organization*, No. 81 C 4371 (N.D. Ill., November 6, 1981).

9. In fact, the language of the order at pages 1349–1350 of the Court's opinion dated October 16, 1981, is identical to the language of the draft order submitted by the government pursuant to the Court's request at the conclusion of the hearing held earlier that day.

10. At the hearing held earlier that day, the Court had indicated that if the government's allegations could be substantiated, it would be inclined to issue a broader order than that embodied in the agreed order consented to by the parties. However, rather than issue such a broad order, which may have indicated as defendants allege that in the Court's view the government's charges had been substantiated as a result of the Court's visit to Aurora, the Court issued a narrower order that was limited in duration and effect and scheduled a subsequent hearing on the merits.

11. The defendants' motion is timely despite the six-day delay between the events that allegedly gave rise to the personal bias and prejudice and the filing of the instant motion. *See United States v. International Business Machines Corp.*, 475 F.Supp. 1372, 1378 (S.D.N.Y.1979); *California v. Kleppe*, 431 F.Supp. 1344 (N.D. Cal.1977) (four-day delay held timely).

The obligation to accept the facts alleged as true, however, "does not preclude the court from putting the facts alleged in their proper context and examining the surrounding circumstances." *United States v. International Business Machines Corp., supra,* 475 F.Supp. at 1379–80 and cases cited therein. Moreover, the movant must establish that the alleged bias and prejudice is personal, stemming from an extra-judicial source and resulting in an opinion on the merits other than what the judge has learned from his participation in the case. *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966); *United States v. Patrick,* 542 F.2d 381, 390 (7th Cir. 1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977). Finally, the judge is presumed to be impartial, and the movant faces a substantial burden in order to rebut that presumption. *Id.; United States v. Jeffers, supra,* 532 F.2d at 1112.

In the instant case, two affidavits have been filed in support of defendants' motion for disqualification together with an affidavit of good faith submitted by defense counsel. Only one of the affiants, Mr. Arthur Stafford, vice-president of PATCO Local 301, is a party to this case by virtue of his being named as a defendant in the amended complaint filed by the government. The other affiant, Mr. Vincent G. Volpe, is not a party herein, though he is a member of PATCO Local 301, which has been named as a defendant, and he has appeared from time to time as a witness for the defense. By its terms, however, 28 U.S.C. § 144 requires that the affidavit submitted in support of a motion for disqualification be that of a *"party to [the]*

*proceeding." See Davis v. Board of School Commissioners of Mobile County, supra,* 517 F.2d at 1050; *United States ex rel. Wilson v. Coughlin, supra,* 472 F.2d at 104; *Giebe v. Pence, supra,* 431 F.2d 942 (affidavit filed by party's counsel is insufficient). Accordingly, the Court technically need only consider the affidavit submitted by Arthur Stafford, the only affiant who is a party to this case, in ruling on the motion for disqualification brought pursuant to 28 U.S.C. § 144. Nevertheless, the Court will also discuss the allegations in the Volpe affidavit in the interest of fully airing all the charges.

 Stafford's affidavit is clearly insufficient for the purpose of imputing to the Court such personal bias or prejudice as would require disqualification under 28 U.S.C. § 144. The affidavit is based entirely on hearsay reports and observations of other persons who were present, unlike Stafford, during the in-chambers conference between the Court, the parties' representatives and counsel for both sides and during the Court's visit to Aurora,[12] and concludes with the blanket statement that on the basis of what Mr. Stafford has been told by others, the Court has acquired a personal bias or prejudice in favor of the government or against the defendants, or both. To the extent that the Stafford affidavit attempts to impute personal bias or prejudice on the basis of statements made by FAA personnel during in-chambers proceedings during which both counsel and representatives of the parties were present or on the basis of the Court's statements during the October 16, 1981, hearing,[13] the

---

**12.** In *Hodgson v. Liquor Salesmen's Local Union No. 2,* 444 F.2d 1344, 1349 (2d Cir. 1971), the Court noted that while hearsay might, in some circumstances, constitute a basis for recusal, "the fact that an application is based entirely on hearsay may be taken into account in judging the sufficiency of the affidavit." The court in *Hodgson* went on to say that "[i]f mere rumor, gossip, or general conclusory opinions were sufficient, any party could reject a judge at will." *Id.*

**13.** Stafford states that he has "been advised" that "representatives of the FAA made unsworn allegations" at the in-chambers conference regarding the effect of defendants' activities on the operation of the Aurora facility and the health and safety of FAA personnel and residents of the area. He further alleges that he has "been advised" that although the Court stated during the October 16 hearing that the government had thus far not produced evidence in support of the allegations, the allegations biased or prejudiced the Court against

affidavit fails to meet the threshold requirement that the bias alleged "must stem from an extra-judicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnel Corp., supra,* 384 U.S. at 583, 86 S.Ct. at 1710; *United States v. International Business Machines Corp., supra,* 475 F.Supp. at 1380–81. For purposes of 28 U.S.C. § 144, personal bias or prejudice refers to some sort of antagonism or animosity toward a party arising from sources or events outside the scope of a particular proceeding. *United States v. Baker, supra,* 441 F.Supp. at 616. As the United States Court of Appeals for the Seventh Circuit noted in *United States v. Patrick, supra,* 542 F.2d at 390 and 390 n. 10, quoting *United States v. Bernstein,* 533 F.2d 775, 785 (2d Cir.), *cert. denied,* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976), in the context of a motion to disqualify pursuant to 28 U.S.C. § 455(b)(1) but in terms equally applicable to the case at bar:

> The rule of law, without belaboring the point, is that what a judge learns in his judicial capacity—whether by way of guilty pleas of codefendants or pretrial proceedings, or both—is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification.

Accordingly, the allegations of bias or prejudice predicated upon statements made either in-chambers in the presence of counsel and the parties' representatives or in open court fail to satisfy the requirement of personal bias or prejudice arising from an extra-judicial source within the meaning of 28 U.S.C. § 144.

■ Stafford's conclusory statement that the government's allegations caused the Court to be unwilling to base its memorandum opinion and order of October 16, 1981, on the evidence adduced in open court but, instead, to personally seek evidence to prove the allegations is also inadequate for the purpose of supporting the motion for disqualification under 28 U.S.C. § 144. Not only is the statement a conclusory assertion of the affiant that need not be accepted as true by the Court, *see Action Realty Co. v. Will, supra,* 427 F.2d at 844, but it is clearly contrary to the facts and record in the case at bar. The opinion and order of October 16, 1981, does not evidence any attempt by the Court to prejudge the merits of the instant case, nor is there any support alleged for the charge that the Court visited the Aurora site in order to seek evidence to prove the government's allegations.[14] In fact, the opinion and order issued on October 16, 1981, does not resolve any of the questions raised within the body of the opinion regarding the effect of the activities at the Aurora facility in favor of the government or defendants; it merely concludes that the seriousness of the allegations, in light of the Court's own observa-

---

defendants or in favor of the government in that the Court was allegedly unwilling to base its opinion and order on the evidence presented in open court but, rather, that "the Judge himself personally set out to seek evidence which would prove [the allegations]."

14. Although we stated in our earlier opinion and order, dated October 16, 1981, that "[i]n part, our visit [to Aurora] was motivated by the failure of the government to bring forth any evidence at the hearing in support of its charges—as alleged at the October 14 conference—of the existence of health and safety risks at the facility and the interference with the effective operation of the facility" 527 F.Supp. 1340 at 1342, it does not necessarily follow that we traveled to Aurora in order to substantiate the government's charges. Rather, our earlier statement reflects the Court's frustration with the government's conduct in making allegations without supporting them adequately in court. The Court visited Aurora in order to better understand the context of the government's allegations and defendants' denials, and the mutually contradictory descriptions of the subject premises by both sides, so that it could make a more informed ruling on the merits after both parties had an opportunity to fully present evidence in their behalf. The Court determined that the proper forum for such an evidentiary presentation was a preliminary injunction hearing and, accordingly, an appropriate order was issued.

tions of the premises, mandate that a hearing be held on the merits during which both sides would have ample time to present their positions and arguments, and the Court would base its opinion on the evidence adduced therein.

Moreover, the record shows that the Court had contemplated visiting the Aurora site prior to the October 16, 1981, hearing and, though counsel for both sides were apprised of the Court's plans, no objections were voiced at that time. As the Court noted in *United States v. State of Washington*, 459 F.Supp. 1020, 1094 (D.Wash. 1978), *app. dismissed on this issue*, 573 F.2d 1121 (9th Cir. 1978), "[t]he propriety of a judge, either with or without a jury, making an on-site view of areas outside the courtroom is well established and, in fact, is recorded in English law as early as the thirteenth century.... And, certainly, ordering such inspections in federal courts is within the sound discretion of the trial judge." [15] There is no justification whatsoever for the charge that the Court has acquired such a personal bias or prejudice against the defendants or in favor of the government by virtue of the on-site visit to Aurora that would warrant its disqualification, and nothing in our opinion and order evidences that the Court was motivated in any way by extra-judicial forces outside the scope of these proceedings in ruling as it has in the past.

The Volpe affidavit is similarly insufficient to require disqualification pursuant to 28 U.S.C. § 144. The only allegation con-

tained therein that could be construed as alleging that the Court acquired a personal, extra-judicial bias or prejudice against the defendants is Mr. Volpe's statement that when the Court arrived at Aurora,

> Judge Aspen questioned me concerning certain conditions, activities and practices at the site of the picketing. In the presence of Judge Aspen, Marshal Wilkes told me a complaint had been received from FAA personnel who were not identified to me concerning parking on the public highway creating visibility problems for traffic.

This allegation, in addition to being inaccurate as to the Court's activities, is totally lacking in the degree of specificity required in the context of a motion seeking disqualification under 28 U.S.C. § 144. Although Mr. Volpe was apparently able to recall the substance of Marshal Wilkes' comment to him with some specificity, he was unable to set forth the substance of the Court's alleged questions "concerning certain conditions, activities and practices at the site of the picketing." [16] It is clear that in order to require disqualification under 28 U.S.C. § 144, "... the affidavit must set forth facts, including the time, place, persons and circumstances, *and, where based upon a extra-judicial statement of the judge, the substance of that statement.*" *Hodgson v. Liquor Salesmen's Union Local No. 2, supra*, 444 F.2d at 1348 (emphasis supplied). The Volpe affidavit clearly fails to meet this standard with respect to the extra-judicial comment attributed to the Court from

---

**15.** Citing IV Wigmore on Evidence (1972) at 362 (other footnotes omitted). *See also Northwestern National Casualty Co. v. Global Moving & Storage, Inc.*, 533 F.2d 320, 323 (6th Cir. 1975).

**16.** In his affidavit filed in support of the government's brief in opposition to defendant's motion, Marshal Wilkes states that, Mr. Volpe's faulty recollection notwithstanding, the Court had no discussions with any PATCO member beyond the short, informal exchange of greetings with Mr. Volpe upon which the defendants now seek to impose an added gloss. Although Marshal Wilkes does confirm that he and Mr. Volpe discussed the cars parked on the

highway, he states that he does not know whether the Court heard this conversation, and Mr. Volpe conspicuously fails to allege that the Court heard or was a party to the conversation between the Marshal and himself. As in *United States v. State of Washington*, 459 F.Supp. 1020 (E.D.Wash.1978), *app. dismissed*, 573 F.2d 1121 (9th Cir. 1978), in which the court denied a motion to disqualify itself, "the record discloses a deliberate and determined effort ... to be a detached observer avoiding comments as fully as courtesy permitted under the circumstances." 459 F.Supp. at 1096.

which personal bias or prejudice is sought to be inferred.

## III.

■ Defendants have also invoked 28 U.S.C. § 455 in support of their motion for disqualification. That statute provides in pertinent part that:

(a) Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

Although the statute imposes a self-enforcing duty upon the judge,[17] its provisions may also ·be asserted by a party to the proceeding. *United States v. Conforte*, 624 F.2d 869, 880 (9th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980).

■ Section 455(b)(1) is substantially similar to 28 U.S.C. § 144. The standard ·under section 455(b)(1), like that under 28 U.S.C. § 144, is whether a reasonable person would conclude, on the basis of the facts alleged, that a judge is biased or prejudiced against a particular defendant. *United States v. Conforte, supra*, 624 F.2d at 880; *Davis v. Board of School Commissioners of Mobile County, supra*, 517 F.2d at 1052; *United States v. Baker, supra*, 441 F.Supp. at 618. The mere fact that a judge has prior knowledge of facts concerning a party is not in and of itself sufficient to require the judge to disqualify himself. *United States v. Patrick, supra*, 542 F.2d at 390;

*United States v. Baker, supra*, 441 F.Supp. at 618. Moreover, facts learned by the judge while acting in his judicial capacity cannot form the basis for disqualification. *Id.*

Section 455(a) is broader and more general in nature than either 28 U.S.C. § 144 or 455(b)(1) and it does not rest on the personal bias or prejudice structure of those two sections. *United States v. Baker, supra*, 441 F.Supp. at 618. The standard under section 455(a) is that disqualification is warranted when a reasonable person would infer that a judge's impartiality might reasonably be questioned. *Davis v. Board of School Commissioners of Mobile County, supra*, 517 F.2d at 1052; *United States v. Baker, supra*, 441 F.Supp. at 617. For all practical purposes, however, the standard under both sections 455(a) and 455(b)(1) is the same, *viz.*, "whether or not given all the facts of the case there are reasonable grounds for finding that the judge could not try the case fairly, either because of the appearance or the fact of bias or prejudice." *United States v. Conforte, supra*, 624 F.2d at 881.[18]

■ Applying these standards to the case at bar, no reasonable person would conclude that the Court is personally biased or prejudiced against the defendants or that the Court's impartiality may reasonably be questioned. As set forth in part II of this opinion, the alleged bias and prejudice that defendants seek to impute to the Court as a result of statements made by FAA personnel or the government during in-chambers proceedings or during the October 16, 1981, hearing itself does not constitute the type of personal bias or prejudice that would justify the Court's disqualification from this case. Moreover, to the extent that defend-

---

17. The identical language can be found in Canon 3(C)(1) and 3(C)(1)(a) of the Code of Judicial Conduct promulgated by the American Bar Association.

18. Put another way, the court in *United States v. Baker*, 441 F.Supp. 612, 617 (D.Tenn.1977) stated that "[a]mong the determinations that

must be made is whether there exists 'a reasonable likelihood that the cause will be tried with the impartiality that litigants have a right to expect in a United States District Court.' " *Quoting United States v. Ritter*, 540 F.2d 459, 464 (10th Cir.), *cert. denied*, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976).

ants seek to impute bias or prejudice as a result of comments the Court might have overheard or observations it may have made at the Aurora facility, this also is insufficient to require disqualification under 28 U.S.C. § 455(a) or 455(b)(1) for personal knowledge of disputed evidentiary facts or reasonably questionable impartiality. As the court stated in *United States v. Conforte, supra,* 624 F.2d at 881, the negative bias or prejudice that requires disqualification exists "only if it is an attitude or state of mind that belies an aversion or hostility of a kind or degree that a fair-minded person could not entirely set aside when judging certain persons or causes." Defendants' allegations do not rise to this level.

Defendants' charges of bias and prejudice and allegations that the Court's impartiality has been tainted are bottomed on the unsupported assumption that the Court's visit to Aurora was motivated by a desire to accumulate evidence to prove the government's claims at the October 16, 1981, hearing that defendants' picketing activities at Aurora endangered the safety of FAA personnel and the efficient operation of the facility. However, the record shows that the Court had indicated to the parties' representatives and their counsel its inclination to visit the Aurora facility *two days prior* to the hearing on October 16, 1981. No objection to the Court's proposal was voiced at the time, and, in fact, counsel agreed not to notify the parties of the Court's visit so that events would be realistic and unstaged in any way. As noted earlier, one of defense counsel inadvertently breached this agreement by notifying the picketers at Aurora of the Court's imminent visit to the facility on October 16, 1981, after the Court notified counsel for both sides that it was going to visit the facility and invited them to come along, which invitations were rejected by counsel for both sides. Although defense counsel subsequently apologized to the Court for notifying the PATCO contingent at Aurora of the Court's visit by letter dated and delivered by messenger on Octo-

ber 16, 1981, counsel, significantly, did not object to the fact or nature of the Court's visit at the time. Moreover, it would seem that if the Court's purpose in visiting the facility was to substantiate the government's charges rather than to just gain a better understanding of the situation and the evidence that had been and that would be presented, the Court would have entered a final order disposing of the matter and not scheduled an evidentiary hearing at which the parties' positions could be more fully developed. The order entered on October 16, 1981, however, was not such an order disposing of the issues on their merits.

The facts and circumstances in the case at bar clearly do not compare with those in *Price Brothers Co. v. Philadelphia Gear Corp.,* 649 F.2d 416 (6th Cir. 1981), the sole case cited and relied upon by defendants in support of their disqualification motion. In that case, the trial judge had directed his law clerk to travel to Beacon, New York, from Dayton, Ohio, and observe the operation of a pipe wrapping machine that was at the core of the breach of contract action before the court at the time. Neither counsel nor the parties were notified of the trip in advance. The machine was under the control of the plaintiff in that case who, according to the court of appeals, "had the opportunity to manipulate what the law clerk saw in order to present an image most favorable to the plaintiff." 649 F.2d at 420. Nevertheless, the court of appeals concluded that disqualification was not required. In contrast, counsel in the case at bar had notice of the Court's visit to Aurora but declined to accompany the Court. Moreover, defendants were notified of the Court's visit before it occurred and, since the site of the Court's visit was under their control, they rather than the government had every opportunity to adjust their activity "in order to present an image most favorable to [themselves]." *See also United States v. State of Washington, supra,* 459 F.Supp. at 1093–97 (denial of motion to disqualify based upon the trial court's inspection trips in anticipation of trial).

In sum, defendants have not shown that the Court harbors a personal bias or prejudice against them or in favor of the government or that the Court's impartiality might reasonably be questioned. Accordingly, for the reasons set forth in this opinion, defendants' motion for disqualification is denied. It is so ordered.